JUDE G. GRAVOIS, Judge.
| ¡.Defendant, Willwoods Community, appeals a judgment of the Twenty-fourth Judicial District Court in favor of plaintiff, Michael 0. Read, finding that defendant breached an oral employment contract having a five-year term and awarding plaintiff $510,328.75 in damages. For the reasons that follow, we affirm.

FACTS AND PROCEDURAL HISTORY

Willwoods is a private charitable foundation subject to the precepts of the Roman Catholic Church. It is uncontested in this case that Willwoods, like any private employer in Louisiana, is subject to Louisiana employment statutes and the laws relating to obligations.
Willwoods is governed by a Board of Trustees. In January of 2009, John Becker was chairman of the Board and Patrick Veters was vice chairman. Also on the Board were Monsignor Christopher Natty and Dr. Frank Schmidt. Father Thomas Chambers served as president of Will-woods.
At a Board meeting held on January 20, 2009, a hiring committee was appointed to fill the newly-created position of executive director. This position was created as part of a succession plan to succeed Father Chambers, who was 74 Lyears old at the time. As Mr. Becker explained, the executive director would be expected to work with Father Chambers, who would delegate responsibilities to him, so that at the time when Father Chambers was prepared to step aside, the executive director could step seamlessly into the position of president. The hiring committee was chaired by Mr. Veters, who was joined by Mr. Becker, Dr. Schmidt, and Monsignor Nal-
ty-
Later that month, plaintiff, who was then 65 years old, dined out with his wife, his mother, and Father Chambers, a close friend of plaintiffs family. The conversation drifted to Willwoods, at which point Father Chambers mentioned that a search for his successor was being conducted. Plaintiff expressed interest, stating that working for a non-profit was something he had considered doing in his “later years.” Within a few days, Mr. Becker contacted plaintiff regarding his interest in the position. Plaintiff submitted his resume and was asked to meet with the hiring committee for an interview.
On the afternoon of February 19, 2009, plaintiff met with the committee at Will-woods’ office. Plaintiff was one of three individuals interviewed for the position. All three individuals were interviewed on the same day, one after the other, with plaintiffs interview being conducted second.[1] During his interview, according to plaintiff, Mr. Veters “made a statement that the committee did not want to go *810 through this procedure again anytime soon, and said that they were looking for someone to make a commitment for five to six years.” Mr. Veters then asked plaintiff, “Mike, given your age of 65, are you prepared to make such a commitment?” Plaintiff responded that he was, explaining to the jury that , he had a very secure position at Capital One Bank where he had been Senior Vice President for eight years and from which he had planned to retire at age 70. He testified that | ¿Willwoods’ expressed need for a five- or six-year commitment was “pivotal in [his] decision to consider leaving Capital One” for employment with Willwoods. He added:
I would have raised the question had it not been asked, because as much as I wanted to work in the Willwoods’ Ministry with a friend such as [Father] Chambers, I could not have afforded to do so without the security of a five-year commitment. That was an absolutely essential component of the job.
Plaintiff further testified:
When [Mr. Veters] asked me that question, and I answered “yes,” I felt we had a meeting of the minds. They wanted a five-year commitment. I wanted a five-year commitment. I felt very comfortable. If I had answered that question “no,” the meeting would have ended right there, because I would have disqualified myself. And we never would have gone any further.
Monsignor Nalty described the interview with plaintiff as “very friendly,” where the committee members were “familiar” with plaintiff. Indeed, Monsignor Nalty testified that he had been friends with plaintiff since high school. Mr. Becker had served on several boards with plaintiff and was aware of plaintiffs involvement in the community. Mr. Veters had been acquainted with plaintiff for about ten years by virtue of his reputation in the community and their serving together on the Board of Holy Cross College. And Dr. Schmidt explained that he had known plaintiff “for quite a few years.”
According to Monsignor Nalty, because everyone on the committee was familiar with plaintiffs resume and his work in the community, the purpose of the interview was for the committee to determine if plaintiffs goals would align with Will-woods’. One factor in this consideration was the individual’s compatibility with Father Chambers. As Monsignor Nalty explained, the committee wanted “someone who [Father Chambers] would be very, very comfortable working with.” | sDue to plaintiffs long and close personal relationship with Father Chambers, plaintiff was thought to be “ideal” for the position.
In addition to compatibility with Father Chambers, the committee was also looking for a committed individual. Whether this commitment was to be for a definite period of time forms the core of the dispute between the parties. As indicated by plaintiffs testimony, he avows that during his interview, Mr. Veters stated the committee was looking for a five- or six-year commitment. However, Mr. Veters and the other committee members present for plaintiffs interview disputed this at trial.
Mr. Veters testified that when searching for an individual to fill the position, the committee was not interested in hiring someone who would leave after six months or a year. Mr. Veters stated he could not recall whether he asked plaintiff during the interview if he was prepared to make a commitment for a certain period of time. But, as he explained, “What was important to me was that [the] person for the executive director position would give it his best efforts.” This was especially so with plaintiff, who
was coming to us at an age of 65. And quite frankly, many people retire. And *811 I wanted to make sure with [plaintiff], more than the other candidates, that he was prepared to give it his best efforts, and I was interested in how long he thought he might work. I was looking for him to give it a good run. And if his intent was to come to Willwoods to a nonprofit, work six months to one year, and then retire, that didn’t appeal to me.... [W]e ended our interview with [plaintiff] answering, “Pat, I’m going to work at this job as hard and as long as I can do it, and give it my best efforts.” When he told me that, I was satisfied.
Mr. Veters further testified that during the interview, plaintiff did not indicate a requirement for long-term employment, nor did he inquire as to the position’s duration. He further explained that from the time the hiring committee was formed until plaintiff was offered the job, there was never any discussion | ¿regarding a term of employment for the position. Throughout his testimony, Mr. Veters repeated that there were no job offers extended to any of the candidates during the interviews.
Monsignor Nalty reiterated the committee’s desire for a commitment longer than one year, testifying:
[G]iven [plaintiffs] age, Mr. Veters ... asked [plaintiff] “[W]hat are you thinking in terms of employment here?” Because we’re talking about a process, and we didn’t know if [plaintiff] was getting ready to retire, and he just wanted to work here for six months, or a year. Or whether he thought that he would be there longer. So, it was just a general interview question. Just like if you came in to hire somebody to work at your restaurant. “You want to work here for the summer, or you want to work here for a few years? And what are your intentions?” So the question revolved around that.
The following colloquy then occurred during plaintiffs direct examination of Monsignor Nalty:
[Plaintiffs Counsel]: The committee wasn’t into hiring someone for six months, or a year?
[Monsignor Nalty]: No.... We didn’t know how long the transition was going to go. To bring someone into this community with the relationships that’s in it, and to have them leave after six months we would have thought that was not our intention .... We did want someone who was desirous of staying there longer.
[Plaintiffs Counsel]: Longer than what?
[Monsignor Nalty]: We didn’t know. Because we didn’t know how long [Father Chambers] was going to be there. He’s still there.... We didn’t want someone who was going to treat Will-woods like a revolving door.
[Plaintiffs Counsel]: So the subject came up?
[Monsignor Nalty]: The subject came up. Yeah. The subject came up. Pat Veters asked [plaintiff] “[D]o you mean this? How long do you want to work?” Because, I think, we all thought [plaintiff] was getting ready to retire. And |7[plaintiff] said “[W]hatever it takes. As long as I can work.”
Then, on redirect, plaintiffs counsel recited a question that had been asked of Monsignor Nalty during his deposition: “ “Whether that succession plan period was fifteen years or ten years, ... did you have a feeling in your own mind as to what that minimum period would be?’ ” Monsignor Nalty recited his answer: “ ‘I don’t think it was more than ten. I probably thought it was. I’d say, perception that it wasn’t discussed. We didn’t discuss it. It was probably between five and ten.’ ”
*812 Monsignor Natty also testified that the committee had not discussed the possibility of extending an offer for a definite term of employment, that there was never any discussion of hiring someone for five or six years, and that the committee did not ask plaintiff for a commitment. He further testified that plaintiff did not inform the committee of his need for long-term employment, nor did he request a commitment from Willwoods.
Mr. Becker also explained that the committee wanted to fill the position with a committed individual, testifying that they were “looking for a commitment to do the full time job.” For this reason, Mr. Becker acknowledged that Mr. Veters asked plaintiff if he was “willing to commit to the job.” Yet, as Mr. Becker explained, it was never determined what the duration of that commitment might be: “We really didn’t have a definite period in mind. It was indefinite. We hired an executive director, and said ‘[Njature will take its course if something comes about where he would take over[.]’” Mr. Becker further testified that there was never a discussion of a contract.
Dr. Schmidt testified that there was never a discussion of extending an employment contract for a certain number of years and that plaintiff never Vindicated during his interview that he needed an employment contract from Willwoods. Dr. Schmidt acknowledged that Mr. Veters inquired as to plaintiffs commitment, but never specified a period of time for that commitment:
Toward the end of the interview, Mr. Veters did ask [plaintiff] what he thought, about his future, and every member of the committee was aware of the fact that at the time [of plaintiffs interview], he was 65 years of age, and [Mr. Veters] wondered whether he was interested in working for a longer time, or what his plans were for the future, and as I remember, [plaintiff] said that he felt he would like to work as long as he felt that he could be productive and could make a contribution.
Dr. Schmidt also explained that the committee did not intend to make any offers on the day of the interviews.
Plaintiff was the unanimous choice of the committee and, about one month after the interview, was informed that he had been selected for the position. Plaintiff met with Mr. Veters on April 24, 2009, at which meeting they discussed more specifics about the job, including salary, benefits, and a start date. They did not discuss a duration for the position, five years or otherwise, and a written contract was not requested, nor was one offered. Plaintiff started working for Willwoods on June 1, 2009.
In late April of 2010, plaintiff learned from Mr. Becker that the committee was meeting to discuss his termination. This was a surprise to plaintiff, who had no knowledge that anything was wrong with his employment at Willwoods. During this conversation, plaintiff did not convey to Mr. Becker that he was under contract. On May 11, 2010, the Board convened and decided to terminate plaintiff. Thereafter, on May 22, plaintiff met with Monsignor Nalty to discuss the possibility of working things out. According to Monsignor Nalty, during this meeting, plaintiff acknowledged that he was not under contract. However, plaintiff | ^¡disputed this, testifying that a contract, or the lack thereof, was never mentioned at this meeting.
Plaintiff was officially notified of his termination at a meeting with Mr. Becker and Mr. Veters on May 25, 2010. According to Mr. Veters, plaintiff did not indicate that he was under contract at this meeting. Plaintiff testified that two days later, he drafted a letter to Mr. Becker and Mr. *813 Veters, stating, among other things, that he expected to receive four years of salary and benefits.
On July 12, 2010, plaintiff filed suit against Willwoods, alleging that it had breached the parties’ oral employment contract for a minimum defined term of five years by terminating plaintiff after only one year without identifying any serious ground of complaint or issue of cause for the termination.
After discovery was conducted and depositions were taken, Willwoods moved for summary judgment, arguing that as a matter of law, plaintiff could not establish that he was employed for a definite term. The trial court granted Willwoods’ motion, dismissing plaintiffs suit with prejudice. On appeal, this Court reversed the trial court’s granting of summary judgment and remanded the matter. Read v. Willwoods Cmty., 11-222 (La.App. 5 Cir. 2/14/12), 88 So.3d 534, writ denied, 12-0616 (La.4/27/12), 86 So.3d 629. A jury trial on the merits was conducted, following which nine of the twelve jurors found that a limited duration employment contract existed between the parties for a term of five years.
On July 23, 2013, the trial court issued its judgment in accordance with the jury’s verdict, noting that in the event the jury found a contract existed, damages would be calculated in accordance with the pretrial stipulations that plaintiffs annual salary was $130,000.00, that the contract was for a term of five years, and that plaintiff had been compensated for one year and 24 days prior to his termination. Pursuant to these stipulations, the court rendered judgment in favor of | inplaintif'f, awarding damages in the amount of $510,328.75, together with interest from date of judicial demand until paid, and for all costs of the proceeding.
On August 5, 2013, Willwoods filed a “Motion for Judgment Notwithstanding the Verdict, and in the alternative, Motion for New Trial.” The trial court denied this motion following a hearing on September 23, 2013. On October 16, 2013, Will-woods sought and was granted a suspen-sive appeal.

LAW AND ANALYSIS

In Louisiana, there are two types of contracts for hire: the limited duration contract and the terminable at will contract. Read, 88 So.3d at 538 (citing La. C.C. arts. 2746-2750). Under a limited duration contract, the parties agree to be bound for a certain period of time during which the employee is not free to depart without assigning cause, nor is the employer at liberty to dismiss the employee without assigning any reason for so doing. Id. The parties must consent to the period of time that is to be the duration of the contract. Id. The party relying on an alleged contract of employment for a set duration of time has the burden of proof that there was a meeting of the minds on the length of time of the employment. Id. Under facts showing no meeting of the minds, the contract of employment for a set duration of time is void for lack of consent, and what remains is a contract of employment terminable at will. Id.
Louisiana Civil Code Article 1846 requires that an oral contract with a “price or value ... in excess of five hundred dollars ... be proved by at least one witness and other corroborating circumstances.” Suite v. Lafayette City-Parish Consol. Gov’t, 04-1459 (La.4/12/05), 907 So.2d 37, 58 (quoting La. C.C. art. 1846). A plaintiff may offer his own testimony in support of his claim; however, the other circumstances which corroborate the claim must come from a source other than the plaintiff. Id.; see also Regel L. Bisso, *814 L.L.C. v. Stortz, 11-25 (La.App-n 5 Cir. 10/25/11), 77 So.3d 1033, 1035-36. For instance, in Swire, the Louisiana Supreme Court found that the plaintiff had failed, as a matter of law, to establish the existence of an oral contract under La. C.C. art. 1846 where the only proof offered by the plaintiff consisted of his own uncorroborated deposition testimony. Id.[2]
The “other corroborating circumstances” need only be general in nature; independent proof of every detail of the agreement is not required. Suite, 907 So.2d at 58.[3]
Whether there are corroborating circumstances sufficient to establish an oral contract under La. C.C. art. 1846 is a finding of fact to be made by the trier of fact and will not be overturned unless it is clearly wrong. Treen Const. Co., Inc. v. Schott, 03-1232 (La.App. 5 Cir. 1/27/04), 866 So.2d 950, 954; Gulf Container Repair Servs., Inc. v. FIC Bus. & Fin.Centers, Inc., 98-1144 (La.App. 5 Cir. 3/10/99), 735 So.2d 41, 43.
In Brodhead v. Bd. of Trustees for State Colleges & Universities, 588 So.2d 748, 749 (La.App. 1 Cir.1991), writ denied, 590 So.2d 597 (La.1992), the First Circuit reversed the trial court, finding that the plaintiff had failed to satisfy his burden of proving that there was a meeting of the minds concerning an alleged oral employment contract for a five-year term. The plaintiff, a former athletic director of Louisiana State University, attended a meeting with representatives of defendant, Southeastern Louisiana University (SLU), where he was asked what it would take to get him as athletic director for SLU. Id. at 750. The plaintiff specified an annual salary of $72,000.00 and a five-year contract. Id. This answer |1i?was met with silence. Id. Approximately one month later, the plaintiff again met with a representative of defendant who had been delegated the task of negotiating a contract with the plaintiff. Id. The plaintiff described this negotiation as follows:
Dr. [Robert] Butler and I discussed [$72,000.00] per year, five-year agreement. He said he would take those back to Dr. [G. Warren] Smith[, president of SLU]. Dr. Butler and I met with Dr. Smith after that and they were discussed again. So I felt at that point in time that since I was going to become Athletic Director, that the entire terms of the agreement had been reached.

Id.

While acknowledging that neither Dr. Smith nor Dr. Butler told him he had a five-year contract of employment, the plaintiff maintained that they told him he had a deal and it needed formalization only. Id. To the contrary, Dr. Smith and Dr. Butler maintained that whenever the five-year employment contract was mentioned, they responded that they would investigate a method for the university to enter into a multi-year contract. Id.
The plaintiff then attended a Board of Trastees meeting, prior to which Dr. Butler cautioned the plaintiff not to be alarmed at what he might hear. Id. at *815 750-51. At the meeting, the Board approved the plaintiffs employment at $46,600.00 for one year.[4] Id. Following the Board meeting, attempts were made between the parties to agree upon a written contract. Id. at 751. Despite an offer from plaintiff and a counter-offer from defendant, the parties did not enter into a written contract. Id.
In support of his contention that there was a five-year contract between the parties, the plaintiff argued his conversation with Dr. Butler prior to the Board meeting demonstrated that the Board’s quotation of salary ($46,600.00) did not reflect the true agreement between the parties, as he was in fact being paid | ia$72,000.00. Id. From this, he argued that, correspondingly, the quotation of a one-year term also did not reflect the agreement between the parties. Id. The First Circuit rejected this argument, finding that “the parties’ meeting of the minds on the salary ... does not compel a conclusion that there was a meeting of the minds on the five-year term of employment.” Id. The court explained: “[TJhere was no prior agreement to a term of employment.... [Sjince there was no prior agreement to a five-year term, and since [the plaintiff] did not agree to an employment term of one year as announced by the Board, his employment was ‘at will.’ ” Id.
Turning to the instant case, the law as discussed above imposes upon plaintiff the burden of proving that there was a meeting of the minds on the duration of the alleged oral employment contract — a burden he was required to meet with at least one witness and other corroborating circumstances.[5] While plaintiff himself may serve as the “one witness,” the “other corroborating circumstances” must come from a source other than plaintiff and need only be general, not independent proof of every detail of the contract. Suire, 907 So.2d at 58.
Upon review, we find that the jury was not clearly wrong in concluding that plaintiff upheld his burden of proving the existence of a fixed-term oral employment contract in light of plaintiffs testimony and other generally corroborative evidence introduced at the trial. Plaintiff testified that during his interview, Mr. Veters “made a statement that the committee did not want to go through this procedure again anytime soon, and said that they were looking for someone to make a commitment for five to six years.” Although Mr. Veters and the other committee members disputed this at trial, we find that the jury’s decision |uto credit plaintiffs testimony over that of the committee members was not clearly wrong.
Willwoods contends, on policy grounds, that a single interview question, such as Mr. Veters’, should not form a fixed-term employment contract lest a chilling effect would result on employers during the job interview process. We do not hold that Mr. Veters’ single interview question, by itself, established the fixed-term employment contract. Rather, this question, in conjunction with other corroborating facts and circumstances, formed a factual basis from which the jury could, and apparently did, reasonably infer a meeting of the *816 minds between the parties concerning a five-year fixed-term employment contract.[6]
Plaintiffs decision to leave “secure employment” with Capital One Bank for employment with Willwoods corroborates the claim that plaintiff only accepted Will-woods’ offer of employment on the condition that it would be for a fixed term.[7] And testimony from each of the four committee members generally 11r,corroborates plaintiffs assertion that there was a meeting of the minds concerning a multi-year employment contract.
Mr. Veters’ testimony indicated that Willwoods wanted a commitment for longer than one year. He testified: “I was interested in how long [plaintiff] thought he might work. I was looking for him to give it a good run. And if his intent was to come to Willwoods to a nonprofit, work six months to one year, and then retire, that didn’t appeal to me.” Monsignor Nalty echoed this sentiment, testifying, “We did want someone who was desirous of staying there longer [than six months or a year].” Notably, the monsignor also acknowledged that he thought the succession plan “was probably between five and ten [years].” Mr. Becker testified: “I was looking for a commitment to do the full time job. And I think [plaintiff] was aware that that was our feeling.” Dr. *817 Schmidt testified that during plaintiffs interview, Mr. Veters inquired as to plaintiffs future, wondering whether plaintiff was interested in working for a longer time and what his plans were for the future.[8]
Although the four committee members avowed at trial that a five-year commitment for the executive director position had neither been discussed prior to nor raised during plaintiffs interview, we find that their testimony indicating their interest in plaintiffs future and his level of commitment, their expressed need for a commitment longer than one year, and Monsignor Nalty’s admission that the succession plan was probably between five and ten years, generally corroborates plaintiffs assertion that there was a meeting of the minds concerning a five-year employment contract. We therefore conclude that the jury was not clearly wrong in finding the existence of an oral five-year employment contract.

\ ^CONCLUSION

For the foregoing reasons, we affirm the trial court’s judgment under review in favor of plaintiff. All costs of this appeal are assessed to Willwoods.

AFFIRMED.

. Mr. Becker recalled plaintiffs interview as being conducted last.

. See also Lakewood Estates Homeowner’s Ass'n, Inc. v. Markle, 02-1864 (La.App. 4 Cir. 4/30/03), 847 So.2d 633, 637-38, writ denied, 03-1511 (La.9/26/03), 854 So.2d 362 (affirming the trial court's judgment that no oral contract was established under La. C.C. art. 1846 where the only proof offered was the uncorroborated testimony of the party seeking to prove the contract).

. See, e.g., Meredith v. Louisiana Fed'n of Teachers, 209 F.3d 398, 403 (5th Cir.2000) (finding that the "corroborating evidence may be the fact that the plaintiff left a secure position to work for [a] new employer.”).

. The plaintiff was in fact paid $72,000.00 per year. Brodhead, 588 So.2d at 751. Dr. Smith explained that $45,000.00 of the plaintiff’s salary was derived from the university’s operating budget and the other $27,000.00 was derived from Booster contributions or external fees. Id. at 751, n. 3.

. It is beyond dispute that the alleged employment contract with an annual salary of $130,000.00 had a “price or value ... in excess of [$500.00].” La. C.C. art. 1846.

. It is noted that the jury was instructed on the law regarding the formation of oral contracts as follows: "In Louisiana, if the price or value is in excess of five hundred dollars, the contract must be proved by at least one witness and other corroborating circumstances. While a plaintiff may serves [sic] as a witness to establish the existence of an oral contract, the other corroborating circumstances must come from a source other than the plaintiff.”

. Although Willwoods argues that the record contains absolutely no evidence that plaintiff left "secure employment” to go to Willwoods, we note that Willwoods, in brief and at oral argument, employs a narrow definition of "secure employment” to denote not-at-will employment, or fixed-term employment. Because plaintiff did not have fixed-term employment at Capital One Bank, Willwoods argues that his departure therefrom cannot corroborate the formation of a fixed-term employment contract with Willwoods. In support of this argument, Willwoods relies on Meredith, supra, at n. 3, in which the plaintiff left fixed-term employment to accept employment which, she argued and the jury found, was also for a fixed term.
Although the plaintiff in Meredith did leave fixed-term employment, which the court described as "secure,” we find the court’s opinion does not stand for the proposition that "secure employment” only denotes employment for a fixed term. In Meredith, the U.S. Fifth Circuit Court of Appeals stated as a principle of law that "corroborating evidence may be the fact that the plaintiff left a secure position to work for the new employer.” Meredith, 209 F.3d at 403 (citing Higgins v. Smith Int’l, 716 F.2d 278, 283 n. 3 (5th Cir.1983), disavowed on other grounds by Overman v. Fluor Constructors, Inc., 797 F.2d 217, 219 n. 8 (5th Cir.1986); Lanier v. Alenco, 459 F.2d 689, 692 (5th Cir.1972)).
Our review of Higgins and Lanier supports our determination that "secure employment” in this context is not limited to the narrow definition of fixed-term employment. In Higgins, the court stated:
The evidence presented at trial indicated that, after some period of discussion initiated by Smith International, Higgins left a well-paying position with a stateside drilling company to do comparable work for Smith International in Brazil. The jury could, and apparently did, draw from these roundly-conceded facts an inference that Higgins took the job with Smith International only after he was assured of some security while in its employ[.]
Higgins, 716 F.2d at 283. In Lanier, the court stated:
[Plaintiff], with a wife and four children, left a secure and well-paying position with General Electric, a position that he had held for eleven years, to join Alenco as a branch sales manager. Like the trial judge, we find it unlikely that [plaintiff] would leave that sort of employment without some substantial representation of a secure position at Alenco.
Lanier, 459 F.2d at 692.

. Although apparently disputed at trial, we note that in its brief on appeal, Willwoods now admits that "... during [plaintiff's] initial February 19, 2009 job interview with Willwoods, Mr. Pat Veters, a member of the Hiring Committee, stated that he did not want to go through this process again anytime soon, and that they said that they were looking for someone to make a commitment for fire or six years.... Mr. Veters then asked [Mr.] Read, ‘Mike, given your age of 65, are you prepared to make such a commitment.' ... [Mr.] Read advised that he was.”