# Supreme Court of Louisiana

FOR IMMEDIATE NEWS RELEASE                                    NEWS RELEASE #013

FROM: CLERK OF SUPREME COURT OF LOUISIANA

The Opinions handed down on the **17th day of March, 2015**, are as follows:

**BY JOHNSON, C.J.**:

2014-C -1475        MICHAEL O. READ v. WILLWOODS COMMUNITY (Parish of Jefferson)

Because we find there is no fixed term employment contract, Mr. Read was an at-will employee who could essentially be terminated at any time.  Thus, Mr. Read has no enforceable action under Louisiana law for damages for his dismissal. We therefore reverse the ruling of the court of appeal.
REVERSED AND RENDERED.

SUPREME COURT OF LOUISIANA

NO. 2014-C-1475

MICHAEL O. READ

VERSUS

WILLWOODS COMMUNITY

**ON WRIT OF CERTIORARI TO THE COURT OF APPEAL,
FIFTH CIRCUIT, PARISH OF JEFFERSON**

**JOHNSON**, Chief Justice

We granted this writ application to determine whether the lower courts erred in finding plaintiff, Michael O. Read, and defendant, Willwoods Community, entered into a fixed term employment contract for five years. For the reasons set forth below, we hold the evidence in the record does not provide a reasonable factual basis for the lower courts' findings. Further, based on our review of the record, the jury's findings were clearly wrong. We therefore reverse the ruling of the court of appeal.

**FACTS AND PROCEDURAL HISTORY**

Willwoods is a non-profit corporation subject to the precepts of the Roman Catholic Church providing ministries in affordable housing, faith and marriage, WLAE TV and Eucharistic Adoration. Willwoods is governed by a Board of Trustees. In January of 2009, John Becker was chairman of the Board and Patrick Veters was vice chairman. Numerous others served as board members, including Monsignor Christopher Nalty and Dr. Frank Schmidt. Father Thomas Chambers served as president of Willwoods. In early 2009, Willwoods established the position of "Executive Director" as part of a succession plan to eventually succeed Father Chambers, who was then 74 years old. At a board meeting on January 20, 2009, a

1

search and hiring committee was appointed to fill the position of Executive Director. The hiring committee was chaired by Mr. Veters, who was joined by Mr. Becker, Dr. Schmidt, and Monsignor Nalty.

Later in January of 2009, Mr. Read had dinner with his wife, mother and Father Chambers, who was a family friend. Mr. Read learned from Father Chambers that Willwoods was conducting a search for his successor. Mr. Read expressed interest, noting that working for a non-profit was something he would like to do before retirement. Several days later, Mr. Becker contacted Mr. Read regarding his interest in the position and asked him to submit a *curriculum vitae*. At the time, Mr. Read was 65 years old and an employee of Capital One Bank for more than eight years.

On February 19, 2009, the search committee interviewed three potential candidates, including Mr. Read. All three candidates were considered extremely qualified. Mr. Read was already known to the committee members with varying degrees of familiarity. Because the Executive Director would work closely with Father Chambers, Mr. Read was considered an ideal candidate due to their friendship. Mr. Read asserts that during the interview Mr. Veters asked him if, given his age of 65, he was prepared to commit to a period of employment for five or six years, to which Mr. Read responded affirmatively. While the search committee members did not have a recollection of the specific questions asked during the interview, they were in general agreement that Willwoods was looking for a dedicated employee who would not leave the job after a few months, and they did not want to go through the search process again any time soon. The committee members also unanimously testified that they never discussed or contemplated offering a specific term of employment to any of the candidates. No offer of employment was made to any of the three candidates on that date.

The committee met some time later to discuss the candidates and unanimously chose Mr. Read for the Executive Director position. Mr. Read testified he was first informed of Willwoods' decision at the Willwoods Gala on March 28, 2009, when Mr. Becker pulled him aside and told him that he was selected by the committee and Mr. Veters would contact him to set up a meeting to discuss the details of the job. That meeting occurred on April 24, 2009, at which time Mr. Read was formally offered and accepted the job. At the meeting, the parties discussed specifics such as salary, benefits, starting date and that the Executive Director would serve on the Board and the Executive Committee. There was no discussion at that meeting regarding a specific term of employment. There was no written contract of employment.

Mr. Read began employment as Executive Director of Willwoods on June 1, 2009. In the Spring of 2010, it became apparent to the Board that there was an issue regarding Mr. Read's continued employment. Mr. Read testified that in late April of 2010 he learned from Mr. Becker that the committee was meeting to discuss his termination. Mr. Read further testified he had no prior knowledge that there was a problem. Mr. Read met with Mr. Becker and Mr. Veters on May 25, 2010, to discuss the situation at which time Mr. Read was advised his employment at Willwoods was "not going to work." Mr. Read did not receive any formal notice of termination at that time and he continued to work at the Willwoods office, testifying that he still hoped things could be worked out. There was testimony that Mr. Read was asked to submit a voluntary resignation, which Willwoods asserts was offered as a courtesy to Mr. Read. Mr. Read refused to resign. Although there is some dispute in the record regarding the exact day, Mr. Read last worked at the Willwoods office some time in June of 2010. On June 23, 2010, Willwoods' attorney sent a formal termination letter

3

to Mr. Read.[1]

Mr. Read subsequently filed suit against Willwoods alleging it had breached their five-year employment contract, seeking damages consisting of the remainder of his salary and benefits for the five-year period. The matter was tried before a jury who found in favor of Mr. Read by a 9-3 vote. Nine jurors specifically found there was a limited duration employment contract between Mr. Read and Willwoods and the duration of that contract was five years. The trial court denied Willwoods' motions for judgment notwithstanding the verdict and new trial, and entered judgment on the jury's verdict. The trial court calculated damages based on a pre-trial stipulation of the parties and awarded plaintiff $510,328.75 in damages, together with interest from the date of judicial demand and all costs of the proceeding. Willwoods appealed and the court of appeal affirmed.[2] Willwoods filed a writ application with this court, which we granted.[3]

## DISCUSSION

The employer-employee relationship is a contractual relationship, and thus an employer and employee may negotiate the terms of an employment contract and agree to any terms not prohibited by law or public policy.[4] Louisiana law provides that employment contracts are either limited term or terminable at will. Under a limited term contract the parties agree to be bound for a certain period during which the employee is not free to depart without assigning cause nor is the employer at liberty to dismiss the employee without cause. When a contract does not provide for a

---

[1] Evidence regarding the details of Mr. Read's termination was not presented at trial. Willwoods specifically waived its affirmative defense that Mr. Read was fired for cause.

[2] *Read v. Willwoods Community*, 14-20 (La. App. 5 Cir. 5/21/14), 140 So. 3d 807.

[3] *Read v. Willwoods Community*, 14-1475 (La. 10/31/14), 151 So. 3d 612.

[4] *Quebedeaux v. Dow Chemical Co.*, 01-2297 (La. 6/21/02), 820 So. 2d 542, 545.

limited term, an employer can dismiss the employee at any time and for any reason without incurring liability.[5] When the employer and employee are silent on the terms of the employment contract, the Civil Code provides the default rule of employment-at-will.[6]

A contract is formed by the consent of the parties established through offer and acceptance.[7] Thus, an enforceable contract requires a meeting of the minds.[8] Unless the law requires a certain formality, offer and acceptance can be made orally.[9] Because there is a presumption that employment is at will, Mr. Read, as the party seeking damages under an alleged contract of employment for a limited term, bears the burden of proving he had a meeting of the minds with Willwoods on the term of employment.[10]

---

[5] These principles are codified in our Civil Code:

La. C.C. art. 2746 provides: "A man can only hire out his services for a certain limited time, or for the performance of a certain enterprise."

La. C.C. art. 2747 provides: "A man is at liberty to dismiss a hired servant attached to his person or family, without assigning any reason for so doing. The servant is also free to depart without assigning any cause."

La. C.C. art. 2749 provides: "If, without any serious ground of complaint, a man should send away a laborer whose services he has hired for a certain time, before that time has expired, he shall be bound to pay to such laborer the whole of the salaries which he would have been entitled to receive, had the full term of his services arrived."

La. C.C. art. 2750 provides: "But if, on the other hand, a laborer, after having hired out his services, should leave his employer before the time of his engagement has expired, without having any just cause of complaint against his employer, the laborer shall then forfeit all the wages that may be due to him, and shall moreover be compelled to repay all the money he has received, either as due for his wages, or in advance thereof on the running year or on the time of his engagement."

[6] *See* La. C.C. art. 2747; *Quebedeaux*, 820 So. 2d at 545.

[7] La. C.C. art. 1927.

[8] *State v. Pelas,* 99-0150 (La. App. 1 Cir. 11/5/99), 745 So. 2d 1215.

[9] La. C.C. art. 1927.

[10] *See* La. C.C. art. 1831; *Suire v. Lafayette City-Parish Consol. Government*, 04-1459 (La. 4/12/05), 907 So. 2d 37, 58; *Krielow v. R&H Supply, Inc.*, 13-217 (La. App. 3 Cir. 10/9/13), 123 So. 3d 1235, 1238; *Clark v. Christus Health Northern Louisiana*, 45,663 (La. App. 2 Cir. 9/22/10), 47 So. 3d 1135, 1140; *Saacks v. Mohawk Carpet Corp.*, 03-0386 (La. App. 4 Cir. 8/20/03), 855 So. 2d 359, 364, *writ denied,* 03-2632 (La. 12/12/03), 860 So. 2d 1158; *Brodhead v. Bd. of Trustees for*

When an employee is hired under a limited term contract and is terminated without cause, the employer is liable to the employee for the amount of salary due under the contract.[11] Mr. Read asserted damages consisting of the remainder of his salary and benefits under a five-year contract. Because Mr. Read is seeking enforcement of an oral contract for more than five hundred dollars, the Civil Code requires that the contract be proved by the testimony of "one witness and other corroborating circumstances."[12] In *Suire*, we explained that "[t]he plaintiff himself may serve as the witness to establish the existence of the oral contract. The 'other corroborating circumstances' need only be general in nature; independent proof of every detail of the agreement is not required. But, the other corroboration must come from a source other than the plaintiff."[13] We must determine whether Mr. Read sustained his burden of proving the existence of an oral contract for a limited term of five years pursuant to La. C.C. art. 1846.

The existence or non-existence of a contract is a question of fact, and the trial court's determination of this issue will not be disturbed unless manifestly erroneous or clearly wrong.[14] Similarly, the issue of whether there were corroborating circumstances sufficient to establish an oral contract is a question of fact.[15] When

---

*State Colleges and Universities*, 588 So. 2d 748, 752 (La. App. 1ˢᵗ Cir. 1991), *writ denied*, 590 So. 2d 597 (1992).

[11] La. C.C. Art. 2749; *Andrepont v. Lake Charles Harbor and Terminal Dist.*, 602 So. 2d 704, 706-07 (La. 1992).

[12] La. C.C. art. 1846.

[13] 907 So. 2d at 58.

[14] *DePodesta v. Breaux*, 12-1594 (La. App. 4 Cir. 5/29/13), 116 So. 3d 1017, 1021; *Dubois Const. Co. v. Moncia Const. Co., Inc.*, 39,794 (La. App. 2 Cir. 6/29/05), 907 So. 2d 855, 857; *Townsend v. Urie*, 00–0730 (La.App. 1 Cir. 5/11/01), 800 So. 2d 11, 15, *writ denied*, 01-1678 (La. 9/21/01), 797 So. 2d 674.

[15] *Commercial Flooring and Mini Blinds, Inc. v. Edenfield,* 13-0523 (La. App. 1 Cir. 2/14/14), 138 So. 3d 30, 36; *Pennington Construction, Inc. v. RA Eagle Corp.*, 94-0575 (La. App. 1 Cir. 3/3/95), 652 So. 2d 637, 639.

evaluating the evidence needed to establish the existence or non-existence of a contract, the trier of fact is allowed to make credibility determinations.[16] The standard of review we must apply to a trial court's or a jury's findings of fact is well settled. A reviewing court may not set aside a trial court's or a jury's finding of fact in the absence of "manifest error" or unless it is "clearly wrong."[17] This court has stated a two-part test for the reversal of a factfinder's determinations: 1) the appellate court must find from the record that a reasonable factual basis does not exist for the finding of the trial court, and 2) the appellate court must further determine that the record establishes that the finding is clearly wrong or manifestly erroneous.[18] We are cognizant of the fact that we must do more than merely review the record for some evidence that supports the lower court's finding.[19] Rather, the reviewing court must review the entire record before it and determine whether the jury's finding was clearly wrong or manifestly erroneous.[20] With the foregoing legal standards in mind, our review of the entire record compels us to conclude that it does not contain sufficient evidence from which a rational trier of fact could find that Mr. Read and Willwoods had a meeting of the minds regarding a five-year employment contract.

In affirming the jury's verdict, the court of appeal found Mr. Read met his burden of proving the existence of a limited term oral employment contract based on his own testimony, as well as other generally corroborative evidence. Specifically, the court pointed to Mr. Read's testimony that during his interview Mr. Veters "made a

---

[16] *Matherne v. Barnum*, 11-0827 (La. App. 1 Cir. 3/19/12), 94 So. 3d 782, 787, *writ denied*, 12-0865 (La. 6/1/12), 90 So. 3d 442; *Imperial Chemicals Ltd. v. PKB Scania (USA), Inc.*, 04-2742 (La. App. 1 Cir. 2/22/06), 929 So. 2d 84, 93, *writ denied*, 06-0665 (La. 5/26/06), 930 So. 2d 31.

[17] *Stobart v. State through Dept. of Transp. and Development*, 617 So. 2d 880, 882 (La. 1993).

[18] *Id.*

[19] *Id.*

[20] *Id.*

7

statement that the committee did not want to go through this procedure again anytime soon, and said that they were looking for someone to make a commitment for five to six years."[21] The court stated that it was not holding that Mr. Veters' single interview question, by itself, established the fixed-term employment contract.[22] Rather, the court reasoned that this question, in conjunction with other corroborating facts and circumstances, formed a factual basis from which the jury could reasonably infer a meeting of the minds between the parties concerning a five-year employment contract.[23] The court found Mr. Read's decision to leave "secure employment" with Capital One Bank for employment with Willwoods corroborated his claim that he only accepted Willwoods' offer of employment on the condition it would be for a fixed term.[24] The court further noted that testimony from the committee members indicating their interest in Mr. Read's future and his level of commitment, their expressed need for a commitment longer than one year, and Monsignor Nalty's admission that the succession plan was probably between five and ten years, generally corroborated Mr. Read's assertion that there was a meeting of the minds concerning a five-year employment contract.[25] We disagree.

For a mandatory term employment contract to exist, "the parties [must] have clearly agreed to be bound for a certain period of time during which the employee is not free to depart without assigning cause and the employer is not free to depart without giving a reason."[26] The evidence in the record falls far short of what is needed

---

[21] *Read*, 140 So. 3d at 815.

[22] *Id*.

[23] *Id*. at 815-16.

[24] *Id*. at 816.

[25] *Id*. at 816-17.

[26] *Daybrook Fisheries, Inc. v. Ketnor*, 01-0388 (La. App. 4 Cir. 1/22/03), 839 So. 2d 223, 225 (internal citations removed).

to establish a contract under which neither Mr. Read nor Willwoods were free to terminate their employment relationship for five years. The crux of the court of appeal's ruling, as well as Mr. Read's claim, are statements attributed to Mr. Veters during the interview on February 19, 2009, inquiring about Mr. Read's willingness to "commit to employment for five or six years" considering his age, and testimony from the other committee members regarding their desire to hire an employee willing to work for longer than a year. However, the relevant testimony fails to prove a clear agreement between Mr. Read and Willwoods regarding a limited term employment contract. Mr. Read testified about the interview:

> Q: Would you call this a chit chat or a social occasion, or something else? How would you describe this?
>
> A: This was a normal interview we were going through.

Mr. Read explained:

> A: During the meeting, Pat Veters made a statement that the committee did not want to go through this procedure again anytime soon, and said they were looking for someone to make a commitment for five to six years. Pat was seated right across from me, and he looked at me, and he said, "Mike, given your age of 65, are you prepared to make such a commitment." And I told Pat that I was. I had a very secure position at Capital One. I'd been here as a Senior Vice President for over eight years. And I planned to retire there by staying there up through age 70. We also had, I had two special needs children…for whom [my wife] and I both provide financial and emotional support. So, when Pat asked the question are you prepared to commit for a period of five to six years that was pivotal in my decision to consider leaving Capital One, and to go to Willwoods.
>
> Q: And how did you respond to Pat's question?
>
> A: I said, I absolutely was.
>
> Q: And why did you respond that way?
>
> A: Because I needed the security of the five year commitment.
>
> Q: And how did you view that question and your answer to the question?

9

A:   When Pat asked me that question, and I answered, yes. I felt we had a meeting of the minds. They wanted a five year commitment. I wanted a five year commitment. I felt very comfortable. If I had answered that question no, the meeting would have ended right here, because I would have disqualified myself. And we never would have gone any further.

The committee members also testified regarding their recollection of this conversation. Monsignor Nalty testified:

Q:   But you do recall, don't you, that Mr. Veters asked Mr. Read something about how long he intended to work, is that right?

A:   I think that given Mike's age Mr. Veter's, Pat, asked Mike what are you thinking in terms of employment here? Because we're talking about a process, and we didn't know if Mike was getting ready to retire, and he just wanted to work here for six months, or a year. Or whether he thought that he would be here longer. So, it was just a general interview question. Just like if you came in to hire somebody to work at your restaurant. You want to work here for the summer, or you want to work here for a few years? And what are your intentions? So the question revolved around that.

Q:   The committee wasn't into hiring someone for six months, or a year?

A:   No....We didn't know how long the transition was going to go. To bring someone into this community with the relationship that's in it, and to have them leave after six months we would have thought that was not our intention. Yeah. We did want someone who [was] desirous of staying there longer. Yeah.

Q:   Longer than what?

A:   We didn't know. Because we didn't know how long Father Tom was going to be there. He's still there.

Q:   Earlier you told the jury longer than six months or a year. Are you changing that testimony?

A:   What I mean is, is that we didn't want someone who was going to treat Willwoods like a revolving door.

Q:   So the subject came up?

A:   The subject came up. Yeah. The subject came up. Pat Veters asked Mike do you mean this? How long do you want to work? Because, I think, we all thought Mike was getting ready to retire.

And Mike said, whatever it takes. As long as I can work. Which is kind of how we treated Father Tom. Father Tom will work until something happens to him, or he doesn't want to work, or obviously if he became incapacitated we wouldn't want him."

Mr. Becker testified similarly:

Q:     Isn't it also true that Pat Veters asked Mike, in view of his age, which was 65, whether he was willing to commit to the job?

A:     I don't exactly recall what Pat said. My feeling was and, I think, I asked Mike this. This is a real job and this is not an extra curricular or another Board to be on, or another situation to be involved with. That wouldn't be a significant position. That's what I recall.

       ***

Q:     Now, as a member of that committee you weren't interested in hiring a new Executive Director for six months or a year were you?

A:     We didn't have a feeling as to the time. We had hired an Executive Director who we felt would perform in that capacity and be ready when the time came with no definite time in mind. When the time came to take over further responsibility if [Father Chambers] left or died, or anything of that sort.

Q:     But it was expressed to Mike wasn't it along the lines, say, "Look Mike, we don't want to have to go through this process anytime again soon." Wasn't that told to Mike?

A:     That was an expectation that we had that we didn't want to go through that again, but I don't know whether it was exactly told to Mike that way.

Mr. Veters also testified:

Q:     Did you ask Mike Read during the interview if he was prepared to make a commitment for a certain period of time?

A:     I don't recall any specific words that were used during the interview.

Q:     Did you ask Michael Read if he was prepared to commit to Willwoods for a period of five or six years?

A:     I don't recall saying that. I recall the [gist] of the conversation I had, and I recall what my intent was, but I don't recall the specific words used.

Q: Now, at the time of these interviews, of the three people including Mike Read, Willwoods was interested, wasn't it, in hiring somebody who was going to make a commitment to Willwoods for a certain period of time. Is that true?

A: On my behalf, no. I can't speak for everybody in the committee, but I can speak for myself.

Q: That wasn't important to you?

A: Not for, as you read it, for a certain period of time.

Q: Yes.

A: What was important to me was that that person for the Executive Director position would give it his best efforts. Particularly with Mike. Mike was coming to us at an age of 65. And quite frankly, many people retire. And I wanted to make sure with Mike, more than the other candidates, that he was prepared to give it his best efforts, and I was interested in how long he thought he might work. I was looking for him to give it a good run. And if his intent was to come to Willwoods to a nonprofit, work six months to one year, and then retire that didn't appeal to me.

Q: But it was important to you, Pat Veters, that someone would be hired who was going to make a commitment to be there for a certain period of time?

A: No. It was important that they would give their best efforts to work at their job as hard and long as they can. That's what Mike told me. When I asked him a question we ended our interview with Mike answering, Pat, I'm going to work at this job as hard and as long [as] I can do it, and give it my best efforts. When he told me that I was satisfied.

Dr. Schmidt recalled Mr. Veter's question to Mr. Read:

Q: Do you remember any questions that may have been asked by Pat Veters to Mr. Read?

A: ...Toward the end of the interview Mr. Veters did ask what he thought about his future, and every member of the committee was aware of the fact that at the time we interviewed him he was 65 years of age, and wondered whether he was interested in working for a longer time, or what his plans were for the future, and as I remember Mr. Read said that he felt that he would like to work as long as he felt he could be productive and could make a contribution. But it was sort of an aside really toward the end of the interview.

Q: Did you ever hear Pat Veters extend an offer to Mr. Read for a certain term of employment?

A: No, I did not.

\*\*\*

Q: It's correct, isn't it, that the hiring committee...was not going through this process of hiring an Executive Director if only for one year, would you agree with that?

A: No, I think that's essentially true. Yes.

We find this testimony, considered along with Mr. Read's decision to leave his job at Capital One, and Monsignor Nalty's testimony that the succession plan to replace Father Chambers could last five to ten years, insufficient to prove that Willwoods intended to enter into a five-year employment contract. Even if we accept that Mr. Read personally believed Willwoods wanted a five or six year contract, this belief was clearly unilateral. According to the undisputed testimony of all of the committee members, a specific term of employment was never discussed or considered for the Executive Director position. Moreover, there was undisputed testimony that since its inception in 1978, Willwoods had never offered any employee a contract for a definite term.

Most troublesome for Mr. Read is the fact that there was absolutely no discussion or mention of a particular length or term of employment after this general discussion at his initial interview on February 19, 2009. At the time of the interview, no employment contract, whether fixed term or at will, was created. By its very definition, a contract is an agreement between two or more parties whereby obligations are created, modified or extinguished.[27] Because consent to form a contract is established through offer and acceptance, an actual offer is indispensable

---

[27] La. C.C. art. 1906.

and no offer of employment was made at the initial interview.[28] The record clearly demonstrates that there was no intent by Willwoods to offer a contract of employment to any of the three applicants on the date of the interview. Although Mr. Read testified that he was told at the interview that they wanted to hire him, he also admitted at trial that he was not offered the job at that time, nor did he have any assurance that he would actually get the job. The committee members also testified that no job offer was extended to Mr. Read on that date, noting the committee had another candidate to interview after Mr. Read. Thus, it was impossible for Mr. Read to consent to a fixed term contract on that date because no offer of employment was tendered.

Mr. Read was eventually offered and accepted the job at a meeting on April 24, 2009. However, the record is devoid of evidence that a limited term employment contract was offered by Willwoods at that time. Although the parties discussed numerous important job specifics at that meeting, there was absolutely no discussion of a five-year employment contract. Mr. Read admitted:

> Q: So, you talked about vacation, fringe benefits. You talked about starting date. You talked about salary, you talked about all of these things. But you didn't talk about a five or six year term at that time, did you?
>
> A: Did not talk about that.
>
> Q: John Becker, and no one from Willwoods ever said, this is a five year contract?
>
> A: Did not.

Moreover, the evidence is undisputed that Mr. Read never inquired about, or requested, a specific term of employment from Willwoods at any time: not at the interview, not when he was offered the job, not when he accepted the job, and not

_____

[28] *See* La. C.C. art. 1927.

after he began employment. Mr. Read is an experienced attorney who practiced estate, corporate and real estate law for more than 20 years before pursuing other interests. He worked for six years in an insurance brokerage and risk management consulting firm before leaving to work for Hibernia National Bank in 2000. Mr. Read was a Senior Vice President at Hibernia heading its client advisory services department, working with businesses and individuals on wealth transition strategies. He continued with Capital One Bank when it acquired Hibernia in 2005. Considering Mr. Read's advanced education and level of professional and business experience, we find it unreasonable that he would rely on the interview discussion as a basis to assert a specific five-year employment contract. None of the statements and questions at the pre-employment interview rise to the level of a promise of a definite term of employment and do not create an enforceable obligation.

Further, the fact that Mr. Read chose to leave his at-will employment with Capital One to accept the job at Willwoods does not constitute sufficient proof to corroborate the existence of a fixed-term employment contract. Other than Mr. Read's subjective belief, the record is void of any objective evidence of his job security at Capital One. Additionally, Monsignor Nalty's testimony regarding the possibility that the succession plan could last five to ten years does not legally suffice to establish or corroborate the existence of a five-year contract. His testimony demonstrates there was no fixed time line for a succession plan because it was uncertain how long Father Chambers would be able to perform his duties and unknown when the succession would need to take effect.

Based on the undisputed evidence in the record, we conclude there is no reasonable interpretation of the evidence which would support a finding that Mr. Read and Willwoods had a meeting of the minds relative to a five-year limited term

15

employment contract. Without facts showing a meeting of the minds regarding a contract of employment for a set duration of time, what remains is a contract of employment terminable at will.[29]

## CONCLUSION

After our review of the entire record, we hold that Mr. Read failed to meet his burden of proving the existence of an oral contract for a limited term of five years pursuant to La. C.C. art. 1846. There is no reasonable interpretation of the evidence in the record to find there was a meeting of the minds which would support the jury's finding that Mr. Read and Willwoods entered into a five-year employment contract. The jury's finding on this issue was clearly wrong.

Because we find there is no fixed term employment contract, Mr. Read was an at-will employee who could essentially be terminated at any time. Thus, Mr. Read has no enforceable action under Louisiana law for damages for his dismissal. We therefore reverse the ruling of the court of appeal.

## DECREE

Reversed and rendered.

---

[29] See *Brodhead v. Board of Trustees for State Colleges and Universities*, 588 So. 2d 748, 752 (La. App. 1st Cir. 1991).