Judgment rendered April 10, 2024.
Application for rehearing may be filed
within the delay allowed by Art. 2166,
La. C.C.P.

No. 55,529-CA

COURT OF APPEAL
SECOND CIRCUIT
STATE OF LOUISIANA

* * * * *

LARALEE HERRON                                    Plaintiff-Appellee

versus

PROFESSIONAL LASER                          Defendants-Appellants
CENTER, LLC, ET AL.

* * * * *

Appealed from the
Fourth Judicial District Court for the
Parish of Ouachita, Louisiana
Trial Court No. 2019-3866

Honorable Alvin Rue Sharp, Judge

* * * * *

NEAL LAW FIRM                               Counsel for Appellants,
By: J. Jordan Haedicke                      Professional Laser
    Spencer Kirby Moore                     Center, LLC
                                            Judy Wagoner

PARKER ALEXANDER, LLC                       Counsel for Appellee
By: Kevin David Alexander
    Chad Curtis Carter

* * * * *

Before STEPHENS, HUNTER, and ELLENDER, JJ.

**HUNTER, J.**

Defendants, Professional Laser Center, LLC and Judy Wagoner, appeal the trial court's judgments which denied, in part, their motion for summary judgment, found them liable for medical malpractice, and awarded damages. For the following reasons, we affirm.

## FACTS

Plaintiff, Laralee Herron, decided to have a tattoo removed from her left lateral torso. After conducting an internet search, plaintiff elected to consult with Professional Laser Center, LLC ("PLC"), a MediSpa in Monroe, Louisiana, to discuss the prospect of having the tattoo removed. Plaintiff met with Judy Wagoner, the sole owner of PLC, and Dr. Victor Zuckerman, the medical director of PLC. Wagoner is non-physician technician, who completed two training sessions to learn the technique for Dermapen TattOff treatments. Dr. Zuckerman, a board-certified pediatrician, also attended weekend training and was the licensed medical professional who was responsible for supervising the treatments and procedures provided by PLC.[1] Dr. Zuckerman and Wagoner were also romantic partners.

Plaintiff testified she believed PLC offered laser tattoo removal because "they're called the Professional Laser Center." However, Dr. Zuckerman and Wagoner informed plaintiff PLC did not provide laser tattoo removal and offered to remove the tattoo by utilizing "Dermapen TattOff"

---

[1] During his deposition testimony, Dr. Zuckerman also professed to be a "diplomat in the American Academy of Anti-Aging."

treatments.[2]  Wagoner assured plaintiff she would be able to remove the tattoo "in two treatments but you never know," and Dr. Zuckerman cleared plaintiff to undergo three to four treatments.  Neither Wagoner nor Dr. Zuckerman performed any pretreatment skin testing to gauge how plaintiff would potentially respond to the treatment.

Wagoner administered plaintiff's first Dermapen TattOff treatment on December 6, 2017.  Thereafter, plaintiff was informed the ink from the tattoo remained visible, and more treatments would be required.  Plaintiff testified Dr. Zuckerman was not present during the procedure.  However, Dr. Zuckerman and Wagoner testified he was present.[3]

---

[2] Dermapen TattOff involves a process whereby a device is used to inject chemicals beneath the surface of the skin to break down the pigmentation from the tattoo ink.

[3] The State of Louisiana allows certain medical laser and chemical peel treatments to be performed by non-physicians for therapeutic or cosmetic purposes.  In 2001, Louisiana State Board of Medical Examiners issued its position that such treatments may only be performed or undertaken under the direct supervision of a Louisiana licensed physician under the following conditions:

(1) A physician must insure that any non-physicians acting under his supervision is appropriately trained and qualified to perform the tasks or treatments that are delegated;
(2) All treatments and procedures must be performed under the licensed physician's direction and immediate personal supervision, i.e., where the physician is physically present on the premises and immediately available at all times that the non-physician is on duty and retains full responsibility to patients and the [Louisiana State Board of Medical Examiners] for the manner and results of all services rendered.
(3) A non-physician serving in such a position could not – and may not under any circumstances be permitted to – act independently or in the absence of a Louisiana licensed physician or exercise independent medical judgment in implementing any procedure or modality of treatment.
(4) In the context of this Statement, an "appropriately trained and qualified" non-physician who assists a physician in the performance of laser or chemical treatments should possess, at a minimum, training in safety, application techniques of each system, cutaneous medicine, indications/contraindications for such procedures, preoperative and post-operative care, potential complications and infectious disease control involved in each treatment.
(5) As is the case with any medical procedure or treatment, the standard of care requires that such treatments be preceded by a history, an appropriate physical examination conducted by a physician, a diagnosis which confirms that any treatment recommended is appropriate for the patient's condition, informed consent, availability and instructions for emergency and follow-up care and the preparation of an appropriate medical record.

On February 1, 2018, plaintiff sent a text message to Wagoner, stating, "[T]he skin seems to be sunken a bit where it's healed – is this normal?"  Over the course of the next year, plaintiff communicated with Wagoner via text messages and sent her photographs of the treated area. Plaintiff expressed her concerns about the healing process, and Wagoner assured her the area would "keep healing over the next few months."  On March 28, 2018, plaintiff informed Wagoner she had been "left with some pretty severe scarring," which she did not believe would heal.  Plaintiff also described the area as looking "like I took a scalpel and cut it out of my skin[.]"  She expressed her displeasure with the Dermapen treatment and inquired about a laser procedure.  Again, Wagoner assured plaintiff she would heal and offered to "microneedle it."[4]

On December 28, 2018, Wagoner performed a second Dermapen treatment on plaintiff.   Plaintiff testified Dr. Zuckerman was not present; Wagoner stated he was present.  On January 2, 2019, plaintiff sent a photograph of the treated area to Wagoner and expressed her concerns about the appearance of the area.  Wagoner told plaintiff the area appeared "normal," and "looks like it should."  Plaintiff's medical records from a January 15, 2019, visit described the area as "healing well."

---

[4] Microneedling is a minimally invasive procedure wherein small needles are used to prick the skin for the purpose of stimulating the production of new collagen and elastin to reduce the appearance of scars, stretch marks, and wrinkles.

Plaintiff moved to Denver, Colorado in March 2018, but returned to Monroe in September 2018.  On October 5, 2018, plaintiff underwent a facial microneedling procedure at PLC.  The facial procedure was unrelated to the tattoo.

In April 2019, plaintiff sent a picture to Wagoner to show her the scarring from the Dermapen treatments and inquired about a microneedling procedure to help with the scarring. Plaintiff also informed Wagoner the scarring was "looking pretty bad right now" and "black specks," in addition to the scarring, had formed in the area. Wagoner agreed the area looked "pretty bad," and she decided to perform the microneedling procedure because "it's been long enough."

On April 23, 2019, plaintiff underwent a microneedling procedure on her face and on the tattooed area. On May 2, 2019, plaintiff sent a photograph of the tattooed area to Wagoner, and reported the area was "very red," and looked "like hamburger meat." Wagoner informed plaintiff the redness was "very common" but "should be much better by tomorrow." The following day, plaintiff sent another photograph to Wagoner and expressed her concerns about the appearance of the area. Plaintiff stated, "I'm really starting to doubt that this procedure was a good idea. I've seen surgical scars that look better than this." When plaintiff requested to speak to Dr. Zuckerman about the matter, Wagoner advised her to "be patient" and wait "at least a couple of weeks to see results." Wagoner further stated, "I promise [time] will help with the scarring[.] I would advise giving it a couple of weeks and then let's take another look at it."

On May 4, 2019, plaintiff sent another photograph to Wagoner, along with a text message stating, "[T]hese scars are really bad." Plaintiff expressed a desire to try a laser removal procedure. Wagoner assured plaintiff the tattoo treatment area was "totally looking better." She also informed plaintiff she was seeing "shadows," rather than scarring. Wagoner also advised plaintiff the Dermapen TattOff removal process was "a very

4

good procedure," and she had experienced "great success" with it. Wagoner also attempted to dissuade plaintiff from seeking laser treatment from a dermatologist by stating, "Laser melts the ink and sends it into the lymphatic system." Plaintiff informed Wagoner she would attempt laser treatments because she could not "imagine [laser] giving worse scars than this."

On July 8, 2019, plaintiff requested a copy of her medical records from PLC. Wagoner agreed to release the records and asked plaintiff whether the microneedling procedure had "helped." Plaintiff replied, "[T]he microneedling didn't seem to make much of a difference." Wagoner advised plaintiff, "[I]t takes four-to-six microneedling treatments to see improvement" and admitted, "Laser might be your best bet now." Plaintiff discontinued communications with Wagoner.

Subsequently, plaintiff sought treatment from a Dr. Janine Hopkins, a board-certified dermatologist. Dr. Hopkins described Dermapen as a "terrible procedure." By January 29, 2021, Dr. Hopkins had performed at least 10 corrective laser procedures on plaintiff's tattoo site.

On December 19, 2019, plaintiff filed a medical malpractice complaint against PLC, Wagoner, and Dr. Zuckerman. The complaint was filed with the Medical Review Panel ("MRP"), and the lawsuit was filed the same day. On December 26, 2019, the Patient's Compensation Fund indicated defendants were not qualified medical healthcare providers under the Louisiana Medical Malpractice Act.[5]

---

[5] On March 18, 2021, defendants filed a motion for summary judgment. The trial court granted partial summary judgment, finding the claims related to the December 2017 Dermapen treatment had prescribed; however, the claims related to the December 28, 2018, treatment had not prescribed.

Following bench trial, the trial court found defendants breached the applicable standard of care. The court stated:

> [T]he overall assessment of what was offered in this case causes this Court to find that Defendants breached the applicable duty in, at least, three ways: (1) failing to have Dr. Zuckerman present at the proper times[;] (2) failing to take the proper "history and physical" of Plaintiff[;] and (3) failing to utilize the proper post treatment care as indicated by Dr. Hopkins and as indicated by the Dermapen Tattoff operating manual.

The trial court apportioned fault as follows: PLC – 5%; Wagoner – 90%; and Dr. Zuckerman – 5%. Damages and costs were awarded as follows: general damages – $30,000; special damages – $5,550; and costs – $6,760.36.

PLC and Wagoner appeal.[6]

## DISCUSSION

Defendants contend the trial court erred in finding plaintiff's claims with regard to the December 28, 2018, treatment were not barred by prescription. Although plaintiff filed her lawsuit on December 19, 2019, defendants argue the claims have prescribed because lawsuit was not filed within one year from the date of discovery of the alleged act, omission, or neglect.

The prescriptive period for medical malpractice is set forth in La. R.S. 9:5628, which provides, in relevant part, as follows:

> A. No action for damages for injury *** whether based upon tort, or breach of contract, or otherwise, arising out of patient care shall be brought unless filed within one year from the date of the alleged act, omission, or neglect, or within one year from the date of discovery of the alleged act, omission, or neglect; however, even as to claims filed within one year from the date of such discovery, in all events such claims shall be filed at the

---

[6] Dr. Zuckerman passed away on April 30, 2021. The portion of the judgment pertaining to Dr. Zuckerman is not at issue in this appeal.

6

latest within a period of three years from the date of the alleged act, omission, or neglect.

***

La. R.S. 9:5628(A) sets forth two prescriptive limits within which to bring a medical malpractice action: one year from the date of the alleged act *or* one year from the date of discovery. *Campo v. Correa*, 01-2707 (La. 6/21/02), 828 So. 2d 502; *Jimerson v. Majors*, 51,097 (La. App. 2 Cir. 1/11/17), 211 So. 3d 651.

Statutes providing for prescriptive periods are to be strictly construed in favor of maintaining a cause of action. *Med. Rev. Panel for Lane v. Nexion Health at Minden, Inc.*, 53,901 (La. App. 2 Cir. 8/11/21), *writ denied*, 21-01410 (La. 11/23/21), 328 So. 3d 82; *Correro v. Caldwell*, 49,778 (La. App. 2 Cir. 6/3/15), 166 So. 3d 442, *writ denied*, 15-1536 (La. 10/23/15), 179 So. 3d 607. Thus, if there are two possible constructions, the one that favors maintaining an action, as opposed to barring, should be adopted. *Id*. Typically, when prescription is raised by peremptory exception, the trial court's findings of fact on the issue of prescription are subject to the manifest error-clearly wrong standard of review. *Id*.

Herein, plaintiff underwent the second Dermapen treatment on December 28, 2018. According to the record, plaintiff's lawsuit was filed December 19, 2019, within one year from the date of the December 28, 2018 treatment. Accordingly, we find the trial court did not err in finding the claims arising from the December 28, 2018, treatment had not prescribed. This assignment of error is without merit.

Defendants also contend as follows: (1) the trial court manifestly erred in concluding most of plaintiff's damages/scarring were caused by the Dermapen treatment administered on December 28, 2018; (2) the trial court

7

manifestly erred in finding PLC and Wagoner committed medical

malpractice; and (3) plaintiff failed to meet her burden of proving her

damages were caused by the negligence of PLC and Wagoner. More

specifically, defendants argue the trial court's findings were based on

plaintiff's "uncorroborated and unsubstantiated" testimony, text messages,

and "poor quality cell-phone images taken randomly in different lighting and

at different distances over a 15-month period." Defendants assert most of

the damages, if any, were attributed to the 2017 treatment, and those claims

are barred by prescription.

La. R.S. 9:2794(A) sets forth the essential elements of a medical

malpractice action which follow the traditional formulation of negligence –

duty, breach, causation, and injury:

> (1) The degree of knowledge or skill possessed or the degree of
> care ordinarily exercised by physicians... licensed to practice in
> the state of Louisiana and actively practicing in a similar
> community or locale and under similar circumstances[.]
> (2) That the defendant either lacked this degree of knowledge or
> skill or failed to use reasonable care and diligence, along with
> his best judgment in the application of that skill.
> (3) That as a proximate result of this lack of knowledge or skill
> or the failure to exercise this degree of care the plaintiff
> suffered injuries that would not otherwise have been incurred.

In a medical malpractice case, the plaintiff bears the burden of

proving a causal relationship between the injury and the accident which

caused the injury. *Maranto v. Goodyear Tire & Rubber Co.*, 94-2603 (La.

2/20/95), 650 So. 2d 757; *Thomas v. Crawford*, 55,085 (La. App. 2 Cir.

5/10/23), 362 So. 3d 1046, *writ denied*, 23-00813 (La. 10/3/23), 370 So. 3d

1077. The burden of proof is by a preponderance of the evidence. La. R.S.

9:2794(C); *Farooqui v. BRFHH Shreveport, LLC*, 55,081 (La. App. 2 Cir.

11/15/23), 374 So. 3d 364, *writ denied*, 23-01661 (La. 2/14/24); *Thomas v.*

8

*Crawford*, *supra*. The test for determining the causal relationship is whether the plaintiff proved through medical testimony that it is more probable than not that the subsequent injuries were caused by the accident. *Maranto v. Goodyear Tire & Rubber Co.*, *supra*; *Thomas v. Crawford*, *supra*.

Causation is a question of fact, and is, therefore, subject to the manifest error standard of review. *Green v. K-Mart Corp.*, 03-2495 (La. 5/25/04), 874 So. 2d 838; *Mart v. Hill*, 505 So. 2d 1120 (La. 1987); *Owen v. Smith*, 44,493 (La. App. 2 Cir. 8/19/09), 16 So. 3d 1274. In order to reverse the factfinder's determination of fact, the reviewing court must review the entire record and find that a reasonable factual basis does not exist for the finding and determine that the record establishes that the factfinder is clearly wrong or manifestly erroneous. *Detraz v. Lee*, 05-1263 (La. 1/17/07), 950 So. 2d 557; *Bailey v. Delacruz*, 49,032 (La. App. 2 Cir. 6/16/14), 143 So. 3d 1220. When findings of fact are based on determinations regarding the credibility of witnesses, the manifest error or clearly wrong standard demands great deference to the findings, for only the factfinder is cognizant of the variations in demeanor and tone of voice that bear on the listener's understanding of what is said. *Murray v. Bostwick*, 52,802 (La. App. 2 Cir. 8/14/19), 276 So. 3d 1120.

In addition to the text messages, photographs, and her own testimony, plaintiff presented the deposition testimony of Dr. Hopkins, a board-certified dermatologist, and the medical report of Dr. Timothy Mickel, a board-certified plastic surgeon. Plaintiff testified she initially became concerned after the first Dermapen treatment because the site "looked pretty red and raw and kind of sunk in." However, Wagoner assured her "that was just part of the process" and the site "would look better over time." Plaintiff

9

eventually decided to undergo a second Dermapen treatment, "after much reassurance from [Wagoner]." Plaintiff described the outcome of the second procedure as "pretty horrific," and she testified as follows:

> The second time, like, they – [Wagoner] took out so much more of my skin the second time around. I had craters in my flesh and, I mean, it was already pockmarked and really rippley and tough-textured. But after the second time, it looked like hamburger meat. It looked like Freddy Krueger's face.

Plaintiff also attested the results of the second Dermapen tattoo removal treatment were "absolutely" worse than the results of the first treatment. According to plaintiff, Wagoner informed her the results "looked normal," and instructed her to "give it more time." After plaintiff insisted on being examined by Dr. Zuckerman, plaintiff described him as "very dismissive." She stated he "took one look" at the area and told her she "looked great." Plaintiff testified she decided to consult with a dermatologist after Wagoner admitted "lasers would probably be [her] best bet at this point."

Additionally, plaintiff stated Wagoner did not instruct her regarding post-treatment care of the site, and, in fact, Wagoner told her not to put anything on the site. Plaintiff testified she was not provided with any post-care instructions, and she was not given any instructions regarding potential complications. Further, plaintiff reiterated Wagoner performed both Dermapen treatments without Dr. Zuckerman's presence or supervision. She stated she only saw Dr. Zuckerman on two occasions – the initial consultation and during "the last appointment where I asked him to take a look at it."

Wagoner testified her primary background was in television, radio, and news media. She stated she did not have a degree in any field, she had

10

never attended medical school, and she has never held herself out to be a medical doctor. Wagoner testified she was initially trained in the Dermapen TattOff process in 2016; she was trained by representatives of Dermapen, and her training consisted of one weekend. She stated she later received another two-day training session approximately one year later. Wagoner stated she has performed the Dermapen TattOff procedure on "roughly" 250-300 clients, and plaintiff was the only client who complained to her about excessive scarring. She further attested her clients routinely communicated with her via text messaging.

Wagoner testified when plaintiff came for her consultation, plaintiff had "done research," and she already knew about the Dermapen TattOff procedure. She stated she informed plaintiff about the possibility of scarring, and she performed a risk assessment, which revealed plaintiff's risk of scarring was "very, very low," and she was a "very good candidate" for the procedure.

Wagoner further testified she administered both of plaintiff's treatments under the supervision of Dr. Zuckerman, and after the procedures, she reviewed aftercare instructions and advised plaintiff to send weekly photographs of the progress. Wagoner also stated she informed plaintiff scarring was a normal side effect of the procedure, and she discussed the side effects prior to plaintiff's first treatment. She stated plaintiff did not send her photographs after the first procedure, and she did not return for the three-week follow-up examination after either procedure. According to Wagoner, plaintiff did not contact her about scarring until February or March of 2018. She testified December 2018 was the perfect time to do the

11

second Dermapen treatment because plaintiff's skin had "completely healed."

Wagoner testified plaintiff did not have any existing scarring prior to undergoing the Dermapen TattOff treatments. According to Wagoner, plaintiff "waited a year after the first treatment to come in and there was – there was not scarring at all." Wagoner also testified Dr. Hopkins was one of her competitors, and any adverse testimony provided by Dr. Hopkins was due to "the competition" between their respective businesses.[7] Wagoner also disagreed with Dr. Mickel's report regarding plaintiff's scarring and hypopigmentation following the Dermapen treatments.

Additionally, Wagoner admitted she did not recommend the use of any type of skin repair solution following plaintiff's treatments because "you cannot use it immediately following" because repair solution would have prevented scabs from adhering to the ink. She also attested one of the representatives from Dermapen advised her not to follow the manual verbatim, and he sent her an email, in which he stated, "Don't use the vitamin rich repair cream until after three weeks because the scab – the ink will not adhere to the scab."[8] Wagoner explained, "[V]itamin enriched repair cream is just a moisturizer [and] if you put a moisturizer on that scab, you're not going to lose the pigment."

---

[7] Both Wagoner's business and Dr. Hopkins' dermatological practice offer various aesthetic treatments, and tattoo removal.

[8] The email from the Dermapen representative was not introduced into evidence because Wagoner claimed she could not find it.

When questioned by the trial court, Wagoner testified scarring can be a side effect of any tattoo removal technique, including laser and microneedling.  She testified as follows:

> [J]ust about anything you do, you can have a scar, okay, or a complication. But the thing about it is, you don't know who's going to scar. You don't know how they're going to scar. You just don't know. You just do what you're told to do, you do the procedure. She wanted the ink out of her body, and I did what she asked me to do, twice. *** After her first procedure, she came in one year later. Well, one year is a really good time because now the skin is healed, the skin is smooth. *** And so, it was the perfect time to retreat that and so, I hit the areas where it – just where that was. I never went over any of the other skin. *** [Y]ou don't know how they're going to react because the skin is already damaged so you're going to put another damage on top of that. *** So, if I had been God and she said I want my ink out and I could pull the ink out, she still would have had that scar. So, the scar was caused by the tattoo. When you take the ink out, now you've put a little more damage on top of that already the damage that was caused from the tattoo. And then you do it again, you add a little more damage, but we try to limit that damage as much as we can. And to be honest with you, she had one of the best results we've ever had.
>
> ***
>
> And had she waited, you know, longer instead of going to Dr. Hopkins and suing, we could have fixed it. It could have been beautiful *** for, like, a fraction of what she spent there. It was – that's what we do. I do scar removals all day long[.] *** I could have helped her, but she didn't want help. She had already made up her mind that she was going to sue.
>
> ***
>
> I haven't done anything wrong. I really didn't. I did nothing wrong. *** I did it as I was trained, as I do everyone. I did it the same exact way I did the first one. And I keep thinking what did I do wrong? I did what she asked me to do and had she finished course, she didn't finish the course. That's the problem. Had she finished it, she would have had a really nice outcome, but she only completed half of it.
>
> ***
>
> [T]he only thing is that I didn't use the vitamin rich repair cream. I think that's the only thing you could find because – and I'm telling you, we were told in the meeting not to use it. *** My trainer said not to use it for sure.

Furthermore, Wagoner admitted she did not search for any literature concerning the use of vitamin rich repair cream. She also testified she did

not know anyone who had the same or similar opinion about using the repair cream because "no one else does the procedure in this area," and she did not consult with other professionals regarding aftercare routines. She reiterated her opinion the use of repair cream was contraindicated because the area needed to be kept dry.

When reviewing the photographs, Wagoner testified the last photographs of the area she treated were taken "right after microneedling," and the area had not healed. She stated the area is "supposed to be dark red for about at least two weeks and that was one day after." She also stated the photographs were taken with a cellphone camera, "and they're very distorting." Wagoner maintained her opinion she did not do anything wrong, described the photographs as "normal," and stated plaintiff "scarred because she had the tattoo." According to Wagoner, much of the hypopigmentation depicted in the photographs was caused by laser treatments performed by Dr. Hopkins.

Dr. Hopkins testified via deposition. She stated she had never used the Dermapen TattOff technique because the treatments cause scarring "because by the nature of the treatment, you're actually damaging healthy tissue[.]" Dr. Hopkins testified plaintiff consulted her "for concerns about scarring and residual tattoo on her body from a previous procedure." Dr. Hopkins described plaintiff's initial consultation as follows:

> \*\*\*
> On examination, she had a combination of hypopigmentation, some skin atrophy as well as some hypertrophy of scar tissue and then she still had areas of tattoo ink within the atrophic and hypertrophic scarring on her skin.
> \*\*\*

14

Dr. Hopkins testified she used laser treatments to "rejuvenate the skin" by allowing plaintiff's body to stimulate new healthy collagen tissue. She stated plaintiff underwent 11 laser treatments between June 2019 and August 2021. She also stated the latter treatments were "just strictly to remodel and treat this scar tissue."

Dr. Hopkins also expressed her opinion regarding the training qualifications necessary to safely administer tattoo removal treatments. She testified as follows:

> Well, the first qualification is someone who's licensed to practice medicine would be, I think, the simplest and most basic, someone who has had training beyond a weekend course in skin anatomy, someone who understands that skin types and how they react to treatment can vary, how areas of the body and the skin on different anatomical locations can vary to treatment responses. I think that the licensed medical professional needs to also understand wound care and wound healing because that is a potential outcome and if you don't know how to take care of complications or potential outcomes then by no means should you perform a procedure.
>
> ***
>
> [U]nderstanding that the procedure you're performing, the steps involved in the procedure, the chemical being used, the laser physics being employed are really essential when you're providing quality medical care and then knowing that the potential side effects of the treatment involve and do you know how to treat the potential side effects or complications.
>
> ***

Dr. Hopkins opined any medical providers who are engaged in tattoo removal services should have knowledge and training in cutaneous medicine and should also understand the importance of providing pre- and post-treatment instructions. Additionally, Dr. Hopkins testified it is essential to obtain an accurate medical history to ascertain whether a patient could potentially pose a higher risk for infection, scarring, and/or slow wound healing due to medical conditions or medications. She also stated the initial consultation for tattoo removal should include a discussion about the

15

procedure, risks, possible side effects, possible complications, and the patient's realistic expectations.

Furthermore, Dr. Hopkins testified with regard to post-treatment care. She stated the treated area should be kept clean, and the formation of scabs should be avoided "because that actually can increase the risk of secondary infection and it certainly increases the risk of scarring." Dr. Hopkins testified the standard of care regarding post-treatment care was not met. She stated:

> [T]here's a whole science of wound healing products that are used to treat open wounds. Even in this scenario, the – according to the protocol of this company that manufactures the Dermapen TattOff, there's a post treatment vitamin rich repair that actually has some very nice ingredients[.] [T]he idea is you don't just let these wounds go without postop care. And certainly even the silicone sheeting could have been used over it to help improve the wound healing process.
> ***
> [T]he fact that in the Dermapen TattOff manual, [vitamin rich repair cream] is listed as one of the required post-treatment products to use, which would certainly make good sense medically and scientifically that you'd want to use a product like that when you just brutally wounded the skin with this Dermapen acid procedure.
> ***

According to Dr. Hopkins, there is a significant difference between scar revision and scar prevention. She stated the goals of proper post-treatment include promoting wound healing and preventing scarring. She also stated, "Recognizing that there's a problem is also part of the responsibility of being a licensed healthcare professional knowing that this wound is not healing the way it should, the patient's developed an infection or for whatever reason some issue's occurring and knowing how to handle that is part of being and practicing medicine." Dr. Hopkins also testified microneedling should not have been used as a component of wound care.

16

She explained microneedling is a "procedure that's employed in some clinical practices to help rejuvenate stretch marks by creating some purposeful wounding so the body can stimulate more collagen."

Dr. Hopkins further testified, "The standard of care for treating unwanted tattoos is lasers and not Dermapen TattOff." She stated attempting to remove a tattoo by injecting chemicals into the skin causes damage to "all the healthy tissue above the ink in order to get rid of the ink." Dr. Hopkins also stated the Dermapen manual recommended using a "test patch" on patients prior to performing the treatment and allowing the tested area to heal before doing further treatments. She asserted the purpose of doing the test patch is to wait and see how the skin would respond and heal. Dr. Hopkins testified Wagoner did not follow the recommended protocol, and had she done so, she would have known further treatments with Dermapen TattOff would have been precluded.

Dr. Hopkins opined Wagoner performed a dermatological procedure without a medical license, and she was unsure "what Dr. Zuckerman's role in this is – if at all." She testified Dr. Zuckerman was a pediatrician, and he did not possess the necessary training and qualifications to serve as the medical director of PLC. She stated the weekend courses undertaken by Dr. Zuckerman were not sufficient to qualify him as a specialist in a facility offering tattoo removal services. Dr. Hopkins testified as follows:

> [C]hildren aren't going to need these aesthetic clinics. Adults are. So, maybe [Dr. Zuckerman was] even less qualified than an internist, who at least does adult medicine versus pediatric medicine.
> ***
> [Dr. Zuckerman] was giving his license to this clinic to allow them to perform procedures on people[.] His involvement was very peripheral at best[.] That is another sort of basic medical rule of thumb. If the doctor who is prescribing the treatment

17

doesn't know how to do the procedure or handle the complications, then no one in their practice should be doing them either.

***

Moreover, Dr. Hopkins stated she did not know whether Dr. Zuckerman was present to supervise plaintiff's procedures. However, she stated, "[H]e certainly did not supervise the postop care, which is really where the biggest part of the problem comes from because it's during the postop care when the patient's texting frequently about her concerns over how this is looking, that there was no medical care provided." Dr. Hopkins further opined Wagoner violated the applicable standard of care "because there was no postop care that addressed the concerns that the patient was having about the full wound healing and the scarring."

Plaintiff also introduced into evidence a medical report prepared by Dr. Timothy Mickel. In this report, Dr. Mickel stated:

> [Plaintiff] was evaluated in my office on 12/09/2019 for pigmentary changes and mild scarring of the left chest wall resulting from tattoo removal by a lay practitioner using a microneedling technique. Apparently, this resulted in an open wound that healed by secondary intention as evidenced by a photographic series that the patient provided for me. She was left with not only mild scarring but also hypopigmentation. In addition, there is some residual blueish black pigment from her original tattoo, which was a single-color tattoo, the same blueish black pigment.
>
> In an effort to improve the situation, the patient has sought laser treatment of the area by a Board-Certified Dermatologist. After 3 treatments, there has been significant improvement in both the texture of the skin and in the hypopigmentation.
>
> ***
>
> While there is no functional deficit from this problem there is certainly an aesthetic issue in this slender young patient in whom this defect would be visible in swim wear or other warm weather attire. In my opinion, there would be continued improvement with additional laser treatments administered by her Dermatologist. It may take 3 or 4 more sessions, and even then, she may be left with some residual hypopigmentation that will be permanent. There are no topical creams that would

18

restore normal pigmentation. Likewise, surgical excision of hypopigmentation would simply result in a visible scar and potentially residual hypopigmentation of the scar tissue.

***

Based on our review of this record, we find the trial court was not manifestly erroneous or clearly wrong in finding defendants breached the applicable standard of care. Implicit in the court's ruling and award of damages is a finding that the breaches in the standard of care caused plaintiff's injuries. The trial court was in the position to view the testimony of the witnesses and observe their demeanor. It is apparent from the ruling he believed plaintiff's testimony with regard to Dr. Zuckerman's absence during the procedures. It is also apparent from the evidence presented, including Wagoner's admissions, Wagoner did not utilize the proper post-treatment care, and she did not perform a proper history by attempting to perform a test patch as recommended by the Dermapen manual. Given the trial court's factual findings expressed in its judgment, and based on our thorough review of the record on appeal, we find no manifest error or any abuse of the trial court's discretion in awarding damages.

Defendants also contend the trial court erred in apportioning 90% fault to Wagoner. According to defendants, plaintiff failed to prove her alleged injuries were caused by Wagoner's negligence, and there was no reasonable basis for apportioning 90% fault to Wagoner. Defendants assert Wagoner is a medical technician, and she could not legally perform Dermapen treatments without Dr. Zuckerman's supervision and oversight. Defendants also argue Dr. Zuckerman was the "superior actor," who "gave out the orders," while Wagoner was the "inferior actor, who carried them out."

The trial court's allocation of fault is subject to manifest error review. *Clement v. Frey*, 95-1119 (La. 1/16/96), 666 So. 2d 607; *Brown v. City of Shreveport*, 50,402 (La. App. 2 Cir. 3/16/16), 188 So. 3d 341; *Ricks v. City of Shreveport*, 42,675 (La. App. 2 Cir. 10/24/07), 968 So. 2d 863. The reviewing court must review the entire record before it and determine whether the factfinder's finding was clearly wrong or manifestly erroneous. *Read v. Willwoods Cmty.*, 14-1475 (La. 3/17/15), 165 So. 3d 883; *Brown*, *supra*. After a court of appeal finds a clearly wrong apportionment of fault, it should adjust the award, but only to the extent of lowering or raising it to the highest or lowest point respectively which is reasonably within the trial court's discretion. *Toston v. Pardon*, 03-1747 (La. 4/23/04), 874 So. 2d 791; *Brown*, *supra*.

In apportioning fault in the case, the trial court considered the nature of the conduct of each defendant, Wagoner, PLC, and Dr. Zuckerman. The court also considered the extent of the causal relation between the conduct of each party and the damage alleged. Wagoner testified she is the sole owner of PLC, and she performed plaintiff's Dermapen treatments, and she advised plaintiff with regard to post-treatment care. The evidence established Wagoner communicated with plaintiff on numerous occasions after the treatments, and despite the images depicted in the photographs, Wagoner repeatedly assured plaintiff she was healing normally. Even during her testimony at trial, Wagoner insisted she did nothing wrong, and maintained plaintiff would have experienced a better outcome had she continued to be treated by her. A reasonable interpretation of the facts of this case supports a finding Wagoner bore a majority of the fault. Accordingly, we find the

20

trial court was not manifestly erroneous or clearly wrong in allocating 90% fault to Wagoner.

Plaintiff contends the trial court erred in finding her claims arising from the December 2017 Dermapen treatment have prescribed. According to plaintiff, the "continuing treatment" doctrine should apply. However, plaintiff did not file an answer to the appeal.

Essentially, an "answer to an appeal" is itself an appeal, except that the answer must specifically state the relief requested, while an appeal usually seeks review of all parts of the judgment. *Bernard v. BFI Waste Serv., LLC*, 2020-636 (La. App. 3 Cir. 7/21/21), 325 So. 3d 415, *writ denied*, 21-01271 (La. 11/17/21), 327 So. 3d 995; *State ex rel. Guste v. Pickering,* 365 So. 2d 943 (La. App. 4 Cir. 1978), *writ denied*, 366 So. 2d 556 (La. 1978). Generally, an answer to an appeal operates as an appeal only of those parts of the judgment complained about in the answer. *Bernard*, *supra*; *Liedtke v. Allstate Ins. Co.,* 405 So. 2d 859 (La. App. 3 Cir. 1981), *writ denied*, 407 So. 2d 748 (La. 1981).

Herein, the proper procedure for an appellee to request modification, revision, or reversal of a judgment is to either file an answer to the appeal or a cross appeal. La. C.C.P. art. 2133; *Garsee v. Sims*, 54,832 (La. App. 2 Cir. 1/11/23), 355 So. 3d 1149, *writ denied*, 23-00407 (La. 6/21/23), 362 So. 3d 428; *Wied v. TRCM, LLC*, 30,106 (La. App. 2 Cir. 7/24/97), 698 So. 2d 685. Plaintiff's brief constitutes neither. Consequently, this Court will not consider plaintiff's request to reverse the trial court's finding the claims arising from the December 2017 treatment have prescribed. To do so would result in a modification, reversal, or revision in favor on a non-appealing

21

party, which is contrary to Louisiana law. See, *Latour v. Steamboats, LLC*, 23-00027 (La. 10/20/23), 371 So. 3d 1026.

## CONCLUSION

For the foregoing reasons, the judgment of the trial court is affirmed. Costs associated with this appeal are assessed as follows: 50% to plaintiff, Laralee Herron, and 50% to defendants, Professional Laser Center, LLC, and Judy Wagoner.

**AFFIRMED.**